**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **EARL AYERS,** *et al.*, | * | |
| **Plaintiffs,** | * | |
| **v.** | * | **Civ. No. DLB-23-3079** |
| **CIOX HEALTH, LLC,** | * | |
| **Defendant.** | * | |

## MEMORANDUM OPINION

Earl Ayers and Melissa Harmon sued CIOX Health, LLC ("CIOX") on their own behalf and on behalf of a putative class for charging a medical records fee they claim violated Maryland's Confidentiality of Medical Records Act ("MCMRA"), Md. Code Ann., Health-Gen. §§ 4-301 *et seq.*; Consumer Protection Act ("MCPA"), Md. Code Ann., Com. Law §§ 13-101 *et seq.*; and Consumer Debt Collection Act ("MCDCA"), Com. Law § 14-202(8). ECF 3. The plaintiffs filed their complaint in the Circuit Court for Montgomery County, Maryland. *Id.* CIOX removed the case to this court. ECF 1. Now the plaintiffs move to remand the case back to state court on the ground that the amount in controversy is not high enough to sustain federal jurisdiction. ECF 10. The motion is fully briefed. ECF 10-1, 17, 21. No hearing is necessary. *See* Loc. R. 105.6. For the reasons that follow, the motion to remand is granted.

## I.     Background

CIOX is a Georgia corporation that contracts with health care providers to maintain, retrieve, and prepare patients' medical records. ECF 3, ¶¶ 2, 18, 21. When CIOX completes a response to a patient's request, CIOX charges the patient certain fees. *Id.* ¶¶ 3–6. One fee is relevant here: When a patient requests a record that CIOX determines does not exist, CIOX charges

the patient what it calls a "Basic Fee" as high as $22.88. *Id.* ¶¶ 6–7. The plaintiffs initially alleged that CIOX has collected between $2 million and $3 million from charging this Basic Fee for requests that are made through Maryland healthcare providers and that turn up no records. *Id.* ¶ 9. CIOX later estimated that between October 3, 2011 and October 3, 2023, the company collected over $2,890,000—about $250,000 each year. ECF 1, ¶ 14 (citing ECF 1-2, ¶¶ 5, 8). The plaintiffs now accept that figure. ECF 10-1, at 15.

On September 7, 2021, Harmon—a Maryland resident—requested her medical records from Medstar Health Physicians in Baltimore, Maryland through her attorneys. ECF 3, ¶ 15. On September 15, CIOX notified her attorneys that it had not been able to locate any records for her. *Id.* ¶ 16. CIOX also sent Harmon an invoice charging her the Basic Fee of $22.88. *Id.* Harmon's attorneys paid the fee, and Harmon later reimbursed them. *Id.*

On September 29, 2021, Ayers—also a Maryland resident—requested his medical records from Southern Maryland Hospital Center in Clinton, Maryland through his attorneys. *Id.* ¶ 13. On October 14, CIOX informed Ayers' attorneys that it found no records for him. *Id.* ¶ 14. CIOX also sent one of Ayers' attorneys an invoice charging Ayers the $22.88 Basic Fee. *Id.* Ayers' attorney paid the fee, and Ayers then reimbursed him. *Id.*

On October 3, 2023, Ayers and Harmon filed a class action complaint against CIOX in the Circuit Court for Montgomery County, Maryland. ECF 1, ¶ 1. The plaintiffs claim that charging the Basic Fee for requests that yield no records violates the MCMRA, the MCPA, and the MCDCA. ECF 3, ¶¶ 94–122. The plaintiffs define the class they seek to represent as

> [a]ll persons who, during the time frame of this complaint, sought copies of Medical Records from a Maryland health care provider, or had their Medical Records requested by some other person pursuant to their authorization, and were charged a fee of any type by CIOX Health, LLC after it was determined that no such Medical Records existed.

*Id.* ¶ 81. The plaintiffs request an order certifying the case as a class action, actual damages, a declaration under the Maryland Declaratory Judgment Act "that CIOX's predatory conduct and unlawful billing and collections practices alleged herein" violate the MCMRA, and an award of reasonable attorneys' fees and costs. ECF 3, at 23; *see also id.* ¶¶ 123–28. The plaintiffs also allege that "[a]s a result of CIOX's failure to comply with the MCDCA," they and the members of the class "suffered actual loss, emotional distress, mental anguish and other damages." *Id.* ¶ 122.

On November 10, 2023, CIOX removed the case to this court. ECF 1. On December 7, the plaintiffs moved to remand. ECF 10. CIOX opposed the motion. ECF 17. The plaintiffs replied. ECF 21. CIOX moved for leave to file a surreply. ECF 22. The plaintiffs opposed that motion. ECF 23.[1] The plaintiffs later filed a notice of supplemental authority. ECF 24.

Meanwhile, on December 1, 2023, Ashley Hoggard and Maia Bar Am, on behalf of themselves and a putative class, sued CIOX in the Circuit Court for Montgomery County, Maryland over several fees CIOX charges for the delivery of electronic medical records: among them, the "Electronic Data Archive Fee," "Digital Archive Fee," "Retrieval Fee," "Instant Download Fee," and "Handling Fee." ECF 2 in *Hoggard v. CIOX Health*, LLC, Civ. No. DLB-23-3457 (D. Md.) ("*Hoggard*"). The complaint in that case expressly disclaimed making any challenge to the Basic Fee for requests yielding no records. *Id.* ¶ 6. On December 21, 2023, CIOX removed *Hoggard* to this court. ECF 1 in *Hoggard*. And on January 19, 2024, the *Hoggard* plaintiffs moved to remand that case to state court. ECF 17 in *Hoggard*.

One other, prior case provides relevant context. On February 3, 2022, Charles Pugh and Veronica Stewart, individually and on behalf of a class, sued CIOX in the Circuit Court for

---

[1] The Court denies CIOX's motion for leave to file a surreply because CIOX has not shown that it is necessary. *See Khoury v. Meserve*, 268 F. Supp. 2d 600, 605–06 (D. Md. 2003). Even if the Court were to consider the surreply, it would make no difference to the holding of this opinion.

Montgomery County, Maryland. ECF 2 in *Pugh v. CIOX Health, LLC*, Civ. No. PX-22-617 (D. Md.) ("*Pugh*"). The *Pugh* plaintiffs challenged both sets of fees that the plaintiffs challenge in this case and in *Hoggard*: the Basic Fee for requests where no records are found and the fees for the delivery of electronic records. *See id.* ¶¶ 7, 54–60. CIOX removed that case to this court. ECF 1 in *Pugh*. The plaintiffs moved to remand. ECF 40 in *Pugh*. Ultimately, the court denied the motion on the ground that the court would have original jurisdiction over the case pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d). On September 26, 2023—about a week before *Ayers* was filed—the *Pugh* plaintiffs voluntarily dismissed their case. *See* ECF 54 in *Pugh*. Counsel in *Pugh* represent the plaintiffs in *Ayers* and in *Hoggard*.

## II.    Standard of Review

When a plaintiff files a case in state court, the defendant has "[t]he right to remove [the] case from state to federal court" if a United States district court would have original jurisdiction. *See Mulcahey v. Columbia Organic Chems. Co.*, 29 F.3d 148, 151 (4th Cir. 1994) (citing 28 U.S.C. § 1441). If the defendant predicates removal on diversity jurisdiction, "the cause of action must be between parties of completely diverse state citizenship, that is, no plaintiff may be a citizen of the same state as any defendant, and the amount in controversy must exceed $75,000." *Elliott v. Am. States Ins. Co.*, 883 F.3d 384, 394 (4th Cir. 2018) (citing 28 U.S.C. § 1332(a)(1)). If the defendant predicates removal on CAFA, the case must be a "putative class action[] with (1) more than 100 class members, (2) an aggregate amount in controversy exceeding $5,000,000, and (3) minimal diversity between the parties." *See Scott v. Cricket Commc'ns, LLC*, 865 F.3d 189, 192 (4th Cir. 2017) (citing 28 U.S.C. § 1332(d)(2), (5)). If the plaintiff challenges the defendant's grounds for removal by moving to remand, the defendant bears the burden of demonstrating that removal is appropriate. *Id.* at 194. "To resolve doubts regarding a defendant's asserted amount in controversy,

'both sides submit proof and the court decides, by a preponderance of the evidence, whether the amount-in-controversy requirement has been satisfied.'" *Id.* (quoting *Dart Cherokee Basin Operating Co. v. Owens*, 574 U.S. 81, 88 (2014)). The question is "not what the plaintiff will actually recover," but rather "the amount that will be put at issue in the course of the litigation"— that is, whether "'a fact finder might legally conclude that' damages will exceed the jurisdictional amount." *Id.* at 196 (quoting *McPhail v. Deere & Co.*, 529 F.3d 947, 956 (10th Cir. 2008), and *Kopp v. Kopp*, 280 F.3d 883, 885 (8th Cir. 2002)).

Because removal raises "significant federalism concerns," courts generally must construe removal jurisdiction strictly. *See Md. Stadium Auth. v. Ellerbe Becket Inc.*, 407 F.3d 255, 260 (4th Cir. 2005) (quoting *Mulcahey,* 29 F.3d at 151). However, "no antiremoval presumption attends cases invoking CAFA." *Scott*, 865 F.3d at 194 (quoting *Dart Cherokee*, 574 U.S. at 89).

## III.    Discussion

CIOX argues that the Court should deny the plaintiffs' motion to remand because the Court has CAFA jurisdiction over this case or, in the alternative, diversity jurisdiction. The parties are fully diverse. And the parties agree that the class has more than 100 members. ECF 1, ¶¶ 2, 18; ECF 3, ¶ 80. The only element of either form of jurisdiction in dispute is the amount in controversy. CIOX asks this Court to aggregate the amount in controversy here with the amount in controversy in *Hoggard*. As a fallback, CIOX offers a variety of arguments for why this case belongs in this court even if the amount in controversy here is considered on its own. None of CIOX's arguments proves availing.

### A. Aggregation with *Hoggard*

CIOX argues that the amount in controversy should be calculated by aggregating the amount at issue here and the amount at issue in *Hoggard*. CIOX is incorrect.

CIOX's argument for aggregation rests on *Freeman v. Blue Ridge Paper Products, Inc.*, 551 F.3d 405 (6th Cir. 2008). In *Freeman*, the plaintiffs in a putative class action divided their original case into five separate cases to keep the amount in controversy in each case below the CAFA threshold of $5 million. *Id.* at 406–07. Each of the five new cases involved the same parties and the same claims as the original case and as the other splinter cases. *Id.* The sole difference was that each splinter case covered the plaintiffs' damages over successive six-month intervals. *Id.* at 407. The district court granted the plaintiffs' motion to remand, finding that the defendant had failed to bear its burden of showing that each case met CAFA's amount-in-controversy requirement. *Id.* On appeal, the Sixth Circuit held that the district court should have aggregated the amounts in controversy in each case and treated them "as if plaintiffs filed a claim worth up to $24.5 million." *Id.* at 409. The reason: The five cases were "identical in all respects except for the artificially broken up time periods," and the plaintiffs' counsel conceded that "avoiding CAFA was the only reason for this structuring." *Id.* To the Sixth Circuit, "[i]f such pure structuring permits class plaintiffs to avoid CAFA, then Congress's obvious purpose in passing the statute . . . can be avoided almost at will." *Id.* However, even as the Sixth Circuit held that the amounts in controversy in these cases should have been aggregated, the court noted that its "holding is limited to the situation where there is no colorable basis for dividing up the sought-for retrospective relief into separate time periods, other than to frustrate CAFA." *Id.*

The Fourth Circuit has never adopted *Freeman* or any comparable rule calling for the aggregation of the amounts in controversy of separate but formerly unified class actions. *See*

*Colbert v. Capital One, N.A.*, No. SAG-20-0165, 2020 WL 8458960, at *2 (D. Md. March 18, 2020) ("Capital One has not directed this Court to any instance in which the United States Court of Appeals for the Fourth Circuit has adopted the 'aggregation' principle that Capital One propounds here."); *McFarland v. Capital One, N.A.*, No. TDC-18-2148, 2019 WL 2330872, at *3 (D. Md. May 31, 2019) ("This aggregation principle has not been adopted by the Fourth Circuit or any other circuit."). CIOX cites only one case from this court that it claims endorsed *Freeman*: *Simon v. Marriott International, Inc.*, Nos. PWG-19-2879 & PWG-19-1792, 2019 WL 4573415 (D. Md. Sept. 20, 2019). According to CIOX, *Simon* "followed the logic of *Freeman*" and aggregated the amounts in controversy across multiple class actions. ECF 17, at 11. Whatever the best way to characterize *Simon* is, *Simon* is not applicable here. *See Colbert*, 2020 WL 8458960, at *2–3 (distinguishing *Simon*). As *Simon* took pains to note, that decision addressed only "the narrow issue" of whether "a class action plaintiff [may] pursue a lawsuit in state court consisting of claims that already are included in a CAFA suit within an existing" federal multi-district litigation. *Simon*, 2019 WL 4573415, at *3. *Ayers* and *Hoggard* do not raise that issue at all. As *Simon* also noted, that decision answered the question before it on narrow grounds: that the claims in the case the plaintiff was trying to remand were "wholly included" in the class actions within the pending multi-district litigation. *See id.* at *4. Neither of the two cases CIOX asks the Court to treat as one wholly includes the claims of the other.

Even if *Freeman* were the law in this circuit, *Freeman* would not call for aggregating this case with *Hoggard*. *Freeman* held that "[b]ecause no colorable basis for dividing the claims has been identified by the plaintiffs other than to avoid the clear purpose of CAFA, remand was not proper." *Id.* at 406. Here, however, there is a colorable basis for dividing the claims: They are substantively distinct claims by distinct classes of aggrieved individuals. In *Freeman*, the cases

involved identical claims, distinguished only by time period. *See id.* Here, the cases involve different claims: in *Ayers*, that the "Basic Fee" for requests turning up no records is unlawful, and in *Hoggard*, that the electronic records fees are unlawful. In *Freeman*, the cases the defendants sought to aggregate involved identical parties. *See id.* Here, the cases the defendant wants to aggregate involve different parties: the people who paid the "Basic Fee" and the people who paid the electronic records fees. Even if some people paid both fees, the classes are not identical. So whereas in *Freeman* there was no colorable basis for dividing the cases, *see id.*, here there is a colorable basis: *Ayers* and *Hoggard* involve different legal claims by different classes of people.

Accordingly, the Court declines to calculate the amount in controversy in this case by aggregating it with *Hoggard*. The amount in controversy in this case is the amount in controversy in this case alone.

### B. CAFA

Next, CIOX contends that even considered on its own, this case's amount in controversy exceeds CAFA's threshold of $5,000,000. The parties agree that there is about $2,890,000 at issue—the putative class's actual economic damages. CIOX claims there is more: at least another $2,890,000 in noneconomic damages, $3 million for the requested declaratory judgment, and $500,000 in attorneys' fees. However, the amount of noneconomic damages at issue, if any, is purely speculative; the value CIOX assigns to the declaratory judgment is arbitrary; and even assuming the projected attorneys' fees are not speculative, they would not be enough to close the gap.

### 1.  Noneconomic Damages

CIOX maintains that the plaintiffs are "entitled to recover an additional $2,890,000 in noneconomic damages for 'emotional distress' or 'mental anguish.'" ECF 17, at 20. That claim is too speculative to sustain jurisdiction.

In identifying the amount in controversy, a defendant may "rely to some extent on reasonable estimates, inferences, and deductions." *Scott v. Cricket Commc'ns, LLC*, 865 F.3d 189, 196 (4th Cir. 2017). However, "[t]o meet its burden, [a defendant] must provide enough facts to allow a court to determine—not speculate—that it is more likely than not that the class action belongs in federal court." *Id.* at 197; *see also Brennan v. Stevenson*, No. JKB-15-2931, 2015 WL 7454109, at *6 (D. Md. Nov. 24, 2015) ("Courts may not engage in conjecture, speculation, or judicial star gazing to determine jurisdiction.") (quoting *Kamau v. Slate*, No. 4:11cv522-RH/CAS, 2013 WL 1883257, at *3 (N.D. Fla. Apr. 4, 2013)) (cleaned up); *Osia v. Rent-a-Center, Inc.*, No. DKC-15-1200, 2015 WL 3932416, at *5 (D. Md. June 25, 2015) ("To allow removal of this case based on Defendant's speculation as to a possible final damage award would eviscerate the amount in controversy requirement.").

Violators of the MCDCA are "liable for any damages proximately caused by the violation, including damages for emotional distress or mental anguish." *Assanah-Carroll v. Law Offices of Edward J. Maher, P.C.*, 281 A.3d 72, 84 (Md. 2022) (quoting Md. Code Ann., Com. Law § 14-203). Maryland law caps noneconomic damages for claims arising after October 1, 2023 at $935,000; the cap is $15,000 lower for each year earlier the claim arose. *See* Com. Law § 11-108(b)(2)(ii). The sum total of the plaintiffs' claim for noneconomic damages is this conclusory allegation: "As a result of CIOX's failure to comply with the MCDCA, Named Plaintiffs and the Class suffered actual loss, emotional distress, mental anguish, other damages." ECF 3, ¶ 122.

Absent from that allegation and from the complaint as a whole is any assertion whatsoever about how much in noneconomic damages the plaintiff is entitled to recover.

CIOX has not provided any facts that would allow the Court to determine the value of the noneconomic damages at issue in this case, rather than merely speculate about them. There is no evidence about what sort of distress the plaintiffs experienced. There is no evidence concerning how many plaintiffs experienced distress. There is no evidence of how much money it would take to compensate each plaintiff who experienced any distress. CIOX's valuation of the plaintiffs' noneconomic damages—$2,890,000—is nothing more than a hypothetical "dollar-for-dollar" match of the plaintiffs' economic damages. ECF 17, at 20. CIOX does not cite any case—let alone a comparable one—indicating that there is any likelihood whatsoever that the plaintiffs will recover as many dollars in noneconomic damages as they will in economic damages. In fact, it is far from clear that the plaintiffs' one-sentence allegation would entitle them to recover *any* noneconomic damages in this case, given how conclusory it is. CIOX's "wholly unsupported assumption" renders its estimate far too speculative to support removal jurisdiction. *See Bartnikowski v. NVR, Inc.*, 307 Fed. App'x 730, 731 (4th Cir. 2009). If CIOX's estimate is not speculative, it is not clear what would be.

All CIOX offers to rebut the plaintiffs' argument that this estimate is speculative is a citation to a single case: *Poole v. Mazda Motor of America, Inc.*, No. PWG-20-466, 2021 WL 2981807 (D. Md. July 15, 2021). *Poole*, CIOX says, shows that "courts in Maryland recognize the possibility of 'significant non-economic damages' including 'hundreds of thousands of dollars in stress related damages' when computing the amount-in-controversy." ECF 17, at 20 (quoting *Poole*, 2021 WL 2981807, at *4). It is true that the *Poole* Court counted noneconomic damages towards the amount in controversy there. *See Poole*, 2021 WL 2981807, at *4–5. Nevertheless,

two distinctions preclude *Poole* from saving CIOX's position. First, *Poole* concerned noneconomic damages under the MCPA. *Poole*, 2021 WL 2981807, at *1. The plaintiffs here request noneconomic damages under the MCDCA. CIOX does not even acknowledge this distinction, much less explain why the Court should impute the noneconomic damages recoverable under one statute to another. Second, and most importantly, *Poole* posed this question in a different posture than this case does: on the defendant's motion to dismiss for lack of subject matter jurisdiction. *See id.* In *Poole*, the plaintiff asserted in his complaint that the amount in controversy exceeded $75,000 because he had paid over $12,000 in economic damages, had already incurred $35,000 in attorneys' fees, and had suffered noneconomic damages sufficient to close the gap with the threshold figure. *Id.* at *5. As the *Poole* Court observed, when the plaintiff asserts that the amount in controversy threshold is met and the defendant moves to dismiss for lack of subject matter jurisdiction, "the sum claimed by the plaintiff controls if the claim is apparently made in good faith." *Id.* at *2 (quoting *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 288 (1938)). In consequence, the defendant bore the burden of establishing "to a legal certainty, that the plaintiff cannot recover the amount claimed." *Id.* (quoting *St. Paul Mercury*, 303 U.S. at 289). In that posture, the only question before the *Poole* Court was whether it was "a legal impossibility" the plaintiff could recover over $75,000. *See id.* All the court held was that it was not.

The case at hand is in a different posture. Here it is the defendant, not the plaintiff, who claims that the noneconomic damages clear the amount in controversy threshold. Unlike the estimate a plaintiff provides in their complaint, the estimate a defendant provides when the complaint is silent does not presumptively control—the defendant must substantiate it. *See Scott*, 865 F.3d at 194. Whereas in *Poole*, the plaintiff needed to show only that it was legally possible that the amount in controversy requirement was satisfied, *see Poole*, 2021 WL 2981807, at *2,

here CIOX bears the burden of proving by a preponderance of the evidence "what the stakes of litigation [] are given the plaintiff's actual demands," *see Scott*, 865 F.3d at 194 (quoting *Brill v. Countrywide Home Loans, Inc.*, 427 F.3d 446, 449 (7th Cir. 2005)). So here CIOX can bear its heavier burden only by showing that there is some reason to think these plaintiffs are actually entitled to millions in noneconomic damages. Yet CIOX has offered nothing more than speculation.

Because CIOX has not demonstrated that the plaintiffs' noneconomic damages are anything other than speculative, the Court finds that they do not contribute to the amount in controversy.

### 2. Declaratory Judgment

The plaintiffs seek a declaration "that CIOX's predatory conduct and unlawful billing and collections practices" violate the MCMRA. ECF 3, at 23. CIOX claims that this declaration is worth $3 million. That number is arbitrary.

"In actions seeking declaratory or injunctive relief, it is well established that the amount in controversy is measured by the value of the object of the litigation." *Francis v. Allstate Ins. Co.*, 709 F.3d 362, 367 (4th Cir. 2013) (quoting *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 347 (1977)). In the Fourth Circuit, courts determine that value "by reference to the larger of two figures": what the relief is worth to the plaintiff or what the relief would cost the defendant. *JTH Tax, Inc. v. Frashier*, 624 F.3d 635, 639 (4th Cir. 2010) (citing *Dixon v. Edwards*, 290 F.3d 699, 710 (4th Cir. 2002)).

CIOX claims that the declaration would cost the company about $3 million. Here is how CIOX calculates that figure. First, CIOX reports that it collects at least $250,000 a year in the fees the declaration would condemn as unlawful. Second, CIOX claims that the plaintiffs are seeking

to recover their actual damages for 12 years of these allegedly unlawful charges. Third, CIOX reasons that because the plaintiffs' "own allegations implicitly assume the existence of a 12-year statute of limitations," CIOX is entitled to use a 12-year period for "its forward-looking projections." ECF 17, at 16. So fourth, CIOX multiplies the $250,000 it charges each year by 12 years to reach $3 million. In CIOX's own words, "[w]ithout the declaratory judgment ruling that such charges are legally impermissible, CIOX could reasonably expect to charge an additional $3,000,000 in future NRF fees during the next 12 years." *Id.* at 15.

Even assuming that the first premise is correct—that CIOX reaps $250,000 a year from the challenged fee—this argument is fatally flawed. The second premise—that the plaintiffs seeks to recover 12 years' worth of fees—is baseless. Nowhere in the complaint do the plaintiffs allege that CIOX charged them the fees at issue for 12 years. And nowhere do the plaintiffs claim that the statute of limitations on their claims is 12 years or otherwise adopt that time period. CIOX gets the 12-year figure from the complaint in *Pugh*—the earlier, since-dismissed case against CIOX whose plaintiffs were represented by the same attorney as the plaintiffs here. Even if the second premise were true, the third premise—that the value of a declaratory judgment condemning these fees is a function of how much CIOX would have made from the fees over the next 12 years—would not follow. The two periods of time have no legal relationship to one another. CIOX cites no authority for connecting them.

All this is to say that CIOX's 12-year timeframe is arbitrary. There is no more reason to assign the declaration the value of 12 years of foregone fees than there is to assign it 13 years, 20 years, or 100 years. After all, without the declaratory judgment, CIOX could expect to keep charging these fees for as long as the company exists. Equally, however, there is no more reason to assign the declaration the value of 12 years of foregone fees than there is to assign it 11 years,

5 years, or 1 year. After all, the company could fold tomorrow or decide to pursue a different source of revenue. Yet the number of years matters. Count nine years of fees or more and the declaration is worth enough in conjunction with the actual damages to lift this case over CAFA's $5 million threshold. Count eight years or fewer and it is not.

CIOX cites no case that supports valuing equitable relief by the company's preferred measures: the length of the statute of limitations on the plaintiffs' claims or the number of years the plaintiffs allege the defendant injured them. And this Court finds none. There do not appear to be any cases pricing equitable relief at 12 years of a company's lost revenue or profits either, for any reason.

The few cases concerning the value of equitable relief that would reduce future business revenue have not answered the question of how many years of lost revenue a court should count. Often, courts dodge that question because the value of even one year of lost revenue is sufficient to clear the amount in controversy bar. In *Wysong & Miles Co. v. Weller Machinery Co.*, 2002 WL 1602456 (M.D.N.C. June 5, 2002), for example, the plaintiff machinery manufacturer sought a declaration that would have impaired the defendant machinery dealer's right to future profits from the dealership. *See id.* at *1, *3. In the previous year alone, the defendant had made $115,000 in gross profits—well more than the $75,000 amount in controversy requirement in a diversity case like *Wysong. Id.* at *3. So the court felt comfortable "[u]sing Defendant's past sales performances . . . as an indicator of its future profits" to find that the defendant met its burden of establishing the amount in controversy. *Id.*

In other cases, courts have been able to avoid this question by drawing lines based on the parties' own dealings. In *JTH Tax, Inc. v. Frashier*, 624 F.3d 635 (4th Cir. 2010), the plaintiff tax preparation franchisor sought an injunction compelling the defendant, a former franchisee, to shut

down his competing tax service. *Id.* at 637. The plaintiff proposed several methods for valuing the requested injunction: among them, the value of the franchise to the plaintiff (130 percent of the previous year's net receipts) and the profits the defendant would have to forgo over the life of the 5-year lease of his franchise office. *Id.* at 639. Without choosing among these formulations, the Fourth Circuit held that by any of the proposed measures, the case met the amount in controversy requirement. *Id.* at 639–40.

Still other cases have combined these features. In *Lanham Ford, Inc. v. Ford Motor Co.*, 101 Fed. App'x 381 (4th Cir. 2004), for example, the plaintiff car dealer sought an injunction against the termination of its franchise by the defendant car maker until the completion of a new hearing before the manufacturer's board. *Id.* at *1. Although it was uncertain precisely how long it would take to complete a hearing, the Fourth Circuit found that it was likely to take at least several months. *Id.* at *2. The Fourth Circuit also found that the plaintiff's gross profits for the previous year exceeded $7 million and that its gross revenues exceeded $56 million. *Id.* Putting that timeframe and those financials together, the court felt that it could be "confident" that the amount in controversy would top the $75,000 required for diversity jurisdiction because "the right to operate for several additional months" was likely worth more than that. *Id.*

None of these cases reasoned as CIOX does. And none of these cases looked ahead nearly as far as CIOX demands. In the absence of any authority for counting the way CIOX wants—by the length of the statute of limitations, by the number of years the plaintiffs claim injury, or for 12 years on any basis—this Court can only conclude that CIOX's 12-year timeframe is arbitrarily long. For that reason, CIOX has not borne its burden of proving that a factfinder could determine that the value of the declaratory injunction is anywhere near $3 million.

### 3.   Attorneys' Fees

CIOX also asks the Court to consider the plaintiff's attorneys' fees as part of the amount in controversy. "Generally, attorneys' fees are not included in the amount-in-controversy calculation." *Francis v. Allstate Ins. Co.*, 709 F.3d 362, 368 (4th Cir. 2013). However, fees are included when the statute under which the plaintiff sues permits the plaintiff to recover them. *Id.* Here, attorneys' fees are recoverable pursuant to the MCPA. *See* Md. Code Ann., Com. Law § 13-408. And the plaintiffs have requested fees in their complaint.

Drawing on the plaintiffs' attorney's ordinary hourly rate and the number of hours he devoted to another recent class action, CIOX estimates that the attorneys' fees in this case would total $500,000. The plaintiffs counter that that estimate is speculative. The Court need not and does not decide. Even assuming without deciding that CIOX has shown that the plaintiffs would recover $500,000 in attorneys' fees, the amount in controversy in this case would be less than $3.5 million—the plaintiffs' $2,890,000 in actual damages plus the fees. As a result, this case would not come close to meeting CAFA's $5 million amount-in-controversy requirement.

To be sure, CIOX describes $500,000 as a "very conservative estimate." ECF 17, at 24. CIOX may well think the plaintiffs would recover even more. But this Court cannot blithely take CIOX's "word that this is really a 'conservative' estimate." *See Bartnikowski v. NVR, Inc.*, 307 Fed. App'x 730, 737 (4th Cir. 2009). And CIOX does not even try to claim that the fees the plaintiffs could recover in this case would exceed the $2 million—four times CIOX's estimate—that it would take to reach CAFA's $5 million threshold.

*         *         *

CIOX's arguments that there is $5 million in controversy in this case fall short. The amount at issue in this case must be considered on its own, not aggregated with the amount at issue in

*Hoggard*. CIOX's claim about the amount the plaintiffs would recover in noneconomic damages is completely speculative. CIOX's claim that the declaration the plaintiffs seek would cost the company $3 million is arbitrary. And even assuming that CIOX's estimate of the plaintiffs' attorneys' fees is accurate, that $500,000 figure is not nearly enough to close the gap. Accordingly, CIOX has not carried its burden of establishing that CAFA confers original jurisdiction over this case upon this Court.

### C. Diversity

In the absence of CAFA jurisdiction, CIOX argues that the Court has diversity jurisdiction. To sustain diversity jurisdiction, the amount in controversy must be greater than $75,000. *JTH Tax, Inc. v. Frashier*, 624 F.3d 635, 638 (4th Cir. 2010). The defendant generally "cannot aggregate class members' damages to meet the $75,000 amount in controversy requirement." *Ndzerre v. Liberty Power Corp., LLC*, 318 F. Supp. 3d 761, 764 (D. Md. 2018) (citing *Covert v. Auto. Credit Corp.*, 968 F. Supp. 2d 746, 751 (D. Md. 2013)); *see also Glover v. Johns-Manville Corp.*, 662 F.2d 225, 231 (4th Cir. 1981) (citing *Snyder v. Harris*, 394 U.S. 332, 335–42 (1969)). Instead, the defendant must show that over $75,000 is at issue for at least one individual plaintiff. *See Ndzerre*, 318 F. Supp. 3d at 765. For the purpose of this calculation, damages and attorneys' fees are divided among the members of the class pro rata. *See Mattingly v. Hughes Elecs. Corp.*, 107 F. Supp. 2d 694, 696–97, 697–98 (D. Md. 2000) (collecting cases).

If CIOX had proven the amount of noneconomic damages, the value of the requested declaratory judgment, and the amount of attorneys' fees it claims—which CIOX has not—the aggregate amount in controversy would be $9,280,000: $2,890,000 in economic damages, $2,890,000 in noneconomic damages, $3 million for the declaration, and $500,000 in attorneys' fees. The plaintiffs allege that the class includes thousands of people; by CIOX's count, there are

at least 100,000. Taking the lowest conceivable number of class members consistent with either party's claims—2,000—the amount in controversy per plaintiff would be a meager $4,640. In other words, even indulging every assumption in favor of CIOX, the pro rata amount in controversy is nowhere near $75,000.

CIOX's sole argument that this case satisfies the amount in controversy requirement for diversity jurisdiction is that the entire value of the declaratory judgment—$3 million, says CIOX—should be ascribed to each individual plaintiff, rather than divided among them all pro rata. This argument rests on *In re Microsoft Corporation Antitrust Litigation*, 127 F. Supp. 2d 702 (D. Md. 2001). In *Microsoft*, the plaintiffs in a multidistrict antitrust class action requested injunctions directing Microsoft to redesign Windows so that the operating system did not include Microsoft's web browser, Internet Explorer. *Id.* at 704, 717–18. The parties did not dispute that it would cost Microsoft $58 million to update Windows to unbundle Internet Explorer. *Id.* at 718. But when the plaintiffs moved to remand, they argued that the case did not satisfy the $75,000 per plaintiff amount in controversy requirement for diversity jurisdiction because the cost of the injunction, "spread over the millions of members of the purported classes," would be well below that pivotal number. *Id.*

The *Microsoft* Court disagreed. *Id.* at 718–19. First, the court acknowledged the baseline rule that "individual claims cannot be aggregated to establish the jurisdictional amount in controversy." *See id.* at 719. Second, the court acknowledged that when equitable relief "simply aggregate[s] monetary claims in another guise," that equitable relief is subject to the anti-aggregation rule. *See id.* Third, however, the court recognized an exception to the rule: When the cost to the defendant is the same whether the relief is granted "for one plaintiff or for millions," the value of the relief should not be divided pro rata. *See id.* Applying that rule, the *Microsoft*

Court held that because "the requested injunctive relief in this case . . . could not be effected without the expenditure of millions of dollars if granted even to one plaintiff," the amount in controversy per plaintiff included the whole value of the injunction. *Id.*

Following *Microsoft*, CIOX claims that the declaration the plaintiffs request could not be "granted even to one plaintiff" without costing the company $3 million in lost revenue because the company would cease to charge anyone the challenged fee if the fee is declared unlawful. *See id.* So CIOX claims that the amount in controversy as to each plaintiff is that plaintiff's actual damages, noneconomic damages, and share of attorneys' fees, plus $3 million.

CIOX overreaches. The value of the declaratory judgment must be spread out over the class, not assigned in full to each individual member. Consider an earlier case: *Gilman v. Wheat First Securities, Inc.*, 896 F. Supp. 507 (D. Md. 1995). The plaintiffs in that class action held brokerage accounts with the defendant and claimed that the defendant illegally accepted payments from third parties for executing the plaintiffs' trades. *Id.* at 508. In addition to actual damages, the plaintiffs sought an injunction barring the defendant from accepting the illegal payments in the future. *Id.* On the plaintiffs' motion to remand, the court held that the amount in controversy should be calculated by dividing the value of the injunction pro rata among the class members. *Id.* at 511–12. The court's rationale is dispositive here: Even "assuming *arguendo* that compliance would cost defendant millions of dollars," "the injunction is worth [that much] to defendant only because the injunction would affect all of defendant's future securities sales to thousands of individual customers." *Id.* at 512. Because the injunction essentially aggregated a high volume of individual future transactions, counting the entire cost of the injunction as part of the per plaintiff amount in controversy would "eviscerate" the baseline rule that "the claims of class members may not be aggregated in order to meet the jurisdictional threshold." *Id.* (quoting *Packard v. Provident Nat'l*

*Bank*, 994 F.2d 1039, 1050 (3d Cir. 1993)). So the *Gilman* Court concluded that there was not enough in controversy to sustain diversity jurisdiction and granted the motion to remand. *Id.* Notably, even as *Microsoft* recognized an exception to *Gilman*'s rule, it reaffirmed that *Gilman* properly applied the rule to the facts before it. *See Microsoft*, 127 F. Supp. 2d at 718–19.

This case is a *Gilman* case, not a *Microsoft* case. Here, as in *Gilman*, the plaintiffs seek equitable relief that would prevent the defendants from collecting small individual payments in the future. Here, as in *Gilman*, the cost of that relief to the defendant is high because of the sheer volume of those likely future transactions. Here, unlike in *Microsoft*, the defendant would not have to incur a large upfront cost to cease its unlawful conduct as to even one plaintiff.

Another case, *Mattingly*, confirms that the value of the declaration should be divided pro rata, like in *Gilman*, rather than considered as a whole, like in *Microsoft*. *See* 107 F. Supp. 2d at 698. In *Mattingly*, as here, the plaintiffs filed a class action against a defendant for charging each member of the class excessive fees in violation of Maryland law. *See id.* at 695–96. There, the plaintiffs sought an injunction barring the defendant from charging the unlawful fees in the future. *Id.* at 696. Here, the plaintiffs seek a declaration to the same effect. There, as here, the defendant argued that the entire value of the injunction should be ascribed to each individual plaintiff, rather than divided pro rata among the class members, because "an injunction affecting the amount of late fees [the defendant] can charge their Maryland customers would cost them more than $75,000 in the aggregate." *See id.* at 698. The *Mattingly* Court rejected that argument, holding that under circumstances like these, a court "must look to the individual pro rata value of the injunction to determine whether there is jurisdiction." *Id.* at 696. This highly similar case should have the same result.

The amount in controversy per plaintiff is nowhere near $75,000. Accordingly, the Court does not have diversity jurisdiction over this case.

**IV.  Conclusion**

For the reasons above, the plaintiffs' motion to remand, ECF 10, is granted. A separate order follows.

Date: May 29, 2024

_____
Deborah L. Boardman
United States District Judge